Good morning. May it please the court, I'm Daniel Kaplan. I represent the appellant Kurt Havelock. I'm going to watch the clock and attempt to reserve about five minutes for a rebuttal. Okay. Whatever you have left. Mr. Havelock's convictions in this case must be reversed for two reasons. First, the record plainly shows that Mr. Havelock had no intent to threaten and dissent the parcels that are the subject of these counts of conviction, a fact that has both constitutional true threat implications and statutory intent to threaten implications. Number two, the parcels that he sent were not addressed to any other person within the meaning of the statute under which he was prosecuted. Because the panel focused on the second issue, I'm going to begin with the second issue, but I'll be happy to switch if the court so desires. The plain language of the statute provides that it applies to anyone who deposits in an authorized depository for mail matter to be sent or delivered by the postal service a communication addressed to any other person containing a threat to injure the person of the addressee or of another. The panel majority applied ordinary principles of interpretation and read those words according to their plain meaning in the context in which they appear in the statute. And the plain meaning of the word person in the context of the statute referring to injury to the person of is a natural person, a human person, not an artificial person in the sense of a corporation or an entity. You say that it's the natural plain meaning is natural throughout. Why isn't it possible for the statute simply to be read with the normal congressional intent per the dictionary definition to say person can be used throughout that paragraph and it may have a broader meaning in terms of addressee and to the extent the context suggests, for example, injury seems to be bodily injury, that that would obviously be to a natural person or somebody being kidnapped even more so. Why is it necessary to say, well, because the addressee in your reading has to be a person, or because the other later on, it has to be a natural person. Therefore, addressee must be person as well. Because all you then wind up doing is saying all you have to do to avoid this statute is not to address it to a person, natural person on the outside of the envelope, but you can do all you want in the body of the letter, which makes it quite clear you're threatening a natural person. Well, the normal principles of interpretation would say that in order to maintain coherence in reading a statute, it's generally assumed that a word used in different parts of the same statute, particularly in different parts of the same sentence or in the same subsection, is assumed to have the same meaning each time. So when Congress gives a clear clue in the statute, in the adjacent language right next to or close to that use of the word person in the phrase addressed to any other person, and it refers to an injury to the person of the addressee, they're giving a clear indication that they intend the addressee to be a person with the capability of sustaining bodily injury. Well, why would they do that? Well, the reason they would do that is apparent from looking at the history of the statute. The first place where this phrase addressed to any other person appeared in the history of what became 876C was the statute that was enacted in 1932, and that statute only dealt with mails sent with the intent to extort. Now, in the context of an extortion letter, there's a clear purpose of focusing on letters that are sent to a human addressee, because if someone is trying to extort somebody, they're not going to want it to be sent and mailed in a way that it could be opened by anybody and read by anybody. It has to be read by the person who's being threatened, who is going to keep it secret because they need to comply with the demands, otherwise the threat may come true. So if it's sent. Can I ask some other questions about the statute as a whole? We're looking at C, but A is the provision that talks about how this thing is to be delivered, right? It says whoever knowingly – C says whoever knowingly sold deposits or causes to be delivered, which I take as a reference back to A. It also says as a foresaid, which is another. I'm sorry? It also says as a foresaid, which is another. Okay. So A says whoever knowingly deposits in any post office or authorized deposit for a mailman or to be sent or delivered, et cetera, according to the directions thereon. Now, isn't according to the directions thereon the part that talks about the address? This is a posit. And then in C, when it talks about addressing, it talks about any communication with or without the name or designating mark subscribed thereto, which I take to mean the thing that's inside the envelope, because why else would it matter if with or without the name or designating mark subscribed thereto means it's signed or it isn't signed. That's talking about the communication. And that's what addressed means is connected to. So it seems to me that it's only A that talks about what's on the envelope with the language according to the directions thereon. And it's C that talks about what's in the envelope. I think I understand your question. And you're suggesting that the communication that is an offense under the statute can be the letter inside the envelope and not the piece of mail as a whole. And I think there's several reasons why that's not what the language of the statute suggests and why that shouldn't be the reading. In the course of explaining that, explain to me what you think with or without a name or designating mark subscribed thereto means. Well, I think that refers to a return address, which naturally might be part of what's on the outside of an envelope. It could be the logo of an institutional envelope. It could be a simple return address that a person writes on. But where does it say anything about return address? It says with or without a name or designating mark subscribed thereto. And it says any communication. Communication has been even held by others of our sister circuits to mean more than just the envelope. And I guess I'm back to Judge Berzon's question, which I think said what I said. It seems to me that we're really looking at A with address to any other person, and I don't know why then we can't use 1 U.S. Code 1 to determine what that is. Okay. Let me give some reasons why the communication that's addressed, that's defined in the statute, shouldn't be read to include the letter that's inside. Number one, that overlooks some of the important context of the statute. If you look back at 876A, it refers to a communication deposits to be sent or delivered according to the direction thereon, any communication. Now, if the direction thereon, the word thereon obviously is referring to the communication. Mail is delivered according to the direction on the outside of the envelope. It's delivered according to the postal address. If the communication is defined to include the letter inside, you would have to read this language as saying the direction thereon could be something written on the letter that's inside. Well, if the letter inside says Poughkeepsie, New York. No, no. It's quite the opposite. That A talks about what's on the outside of the letter first and then talks about the communication inside the letter. And that part of A, the first part of it, is what's referred to in all the other subsections. Well, what I'm trying to do is indicate the meaning of the communication. Is the communication the piece of mail or is it the letter inside? And the communication carries over to C. I'm suggesting that the communication in C must mean the same thing as the communication in A for the reasons that I've been talking about. Doesn't communication have to have some substance to it? Doesn't communication refer to the contents, the message that's being sent to the address C? Not according to the language of the statute. The first reason why is what I've suggested about the direction thereon referring to the envelope, the piece of mail as a whole. There's another reason, which is that that interpretation would effectively read this phrase addressed to any other person out of the statute, which, of course, is something the court is not supposed to do in interpreting a statute. If you read the communication to include the letter inside, you're suggesting that Congress bothered to say that a threat has to be addressed to any other person. If you're talking about the letter inside, the phrase addressed to has to be read in this Gettysburg sense that the government is causing. Well, if the letter inside, I guess the question, if the statute can only mean natural people, does it matter, in this case, do you win there and it doesn't matter whether we consider the inside or is it your position that the letter inside does make a threat to a natural person? My position is that the threatening piece of mail has to be postally addressed to a natural person and it doesn't matter what's inside in terms of the letter inside. Well, but let's just say that we say that we do get to consider what's inside. Is that addressed to a natural person? In the sense of assuming that there's a threat, which I hope we'll talk about that there wasn't one, but assuming that there was a threatening language in there. Any threat, anything that qualifies as a threat under the statute, anything that actually expresses an intent to inflict bodily harm on somebody is addressed to some other person in the Gettysburg sense. Are you saying that it doesn't matter what it says in the letter itself if it's not addressed to anybody by the normal sense of dear Mr. Jones or dear President Obama or anything, that it's still a threat addressed simply because it's a threat? I'm saying that the statute requires not that the threat be addressed to another person, but that the communication be addressed to another person. All right, that's what I'm saying. The communication inside is not in one sense addressed to anybody. It's just a manifesto. You're saying you concede that that means it's a threat addressed to somebody. No. I agree with the panel majority that a threat addressed to the world at large would not be something that should follow. Well, okay, so if we decide that you consider the inside as well as the outside, despite what you're arguing, that you lose, inconceivable as that may be, on the argument that it's only the envelope we consider. If you consider the inside on which the threat is contained, you're saying that the threat is addressed to somebody, even though it's a manifesto which contains nothing on the top saying to whom it's addressed. No, I don't concede that. I agree with the panel majority that if the manifesto is not addressed to any clearly identified people, it's sort of to the injustice of society. And you don't care if you lose on whether it has to be on the envelope. I want to win on every consideration. I know you do. Okay. Well, that isn't necessarily the wisest way to proceed. You want to win in some way that matters. And I guess I have a similar question. Not only to whom is this letter addressed means what I was suggesting and others were suggesting it means, i.e., inside the envelope. Who was it addressed to? Not who was threatened, but who was it addressed to? It's not actually a threat to anybody. That's not answering my question. We don't have to get to that yet. But the panel made the observation that it's effectively, if you read the manifesto, I circled all the places that said you, and I was hard-pressed to say who you was supposed to be when it says you. You as people with money, you as society at large, you as government entities, you as the liquor board. Really, it's not addressed to anybody. And it's the alternative that it was addressed to the media companies to which it was sent, you know, who opened it up. And then we're back to the natural person question. Yes. Right? Yes, I think so. Let me make sure I understand your position. Let's say you address it properly on the outside of the envelope. So, I mean, let's say you send an identified person, John Smith, a letter. I mean, real John Smith, right? And the letter says, I just want to let you know that I'm going to be killing your brother, Bob Smith. Right. So, first problem is not a problem. It is properly addressed. I'm sorry. It is properly addressed. So, it's not a problem because it says John Smith. It's addressed to a natural person. The fact that it's threatening another person doesn't matter under the statute. I'm sorry? Under the statute, it doesn't matter that the threat is directed to someone other than the addressee. When you say it doesn't matter, it's a violation of the statute. Yes, because the statute says... Wait for my question. Sorry. Who, at that point, is being threatened? Is it John, the addressee, or Bob, the person that is going to be the target of the killing? Bob, because the language refers to threat to injure the person.  What if it says, if you don't give me $10,000, I will kill Bob? Who is being threatened at that point? Well, now you're talking about an extortion. Well, it may be extortion, but I don't want to talk about extortion. I'm asking who is being threatened. Or, you know, I have your daughter captive, and if you don't come up with, you know, $1 million, I will kill her and dispose of her body in the river. Okay. Who, at that point, is being threatened? Well, I think you could certainly describe that as a threat to the addressee, because the addressee is being threatened with a harmful thing, not a physical injury to him, but an injury... And under the statute, does it matter who is being threatened, whether it is a threat directed against the recipient, or the victim, or both? No. It does not matter, because it says to injure the person... So I'm wondering, when you're talking about the manifesto, and it says you don't know who those yous are, why does it matter who the yous are? So long as somebody is being threatened in the communication, it doesn't really matter. It could be the recipient. It could be these other people. Why does it really matter who they are? Because a threat that's directed to the world at large, as the majority in the panel put it, is not... It depends what the threat is. If the threat is of nuclear attack, then a threat to the world at large would be a serious threat. So if you say, I'm going to detonate a nuclear weapon in Cincinnati, I would be pretty scared being in Los Angeles. Or perhaps even if the threat were to have a nuclear weapon in Delhi, I would feel... So it really matters the nature of the threat, doesn't it? It really matters if you have a broad enough threat against a broad enough group of people, then why couldn't you say all people that are within the target range, that could have been at the game, that could have been involved in the Super Bowl weekend, therefore celebrations, was potentially under threat. You can say that if the contextual facts support it, and I will grant you that there are hypothetical situations where that could exist. The point I was trying to make earlier is that any threatening communication that's actually intended to threaten is going to be addressed in the Gettysburg sense, directed to some other person. You can't literally threaten yourself. So you're reading that phrase out of the statute. That's part of the point I was trying to make. That's why the Gettysburg... Unless you thought that addressed to another person, you seem to be skipping over that in a different way. And I would be interested in your getting to the true threat issue, by the way. But just to finish this, what you're doing is skipping over the address to another person, assuming that that doesn't have some sense of direction as well, leaving the threat out of it. Does it inside have to be directed at someone or addressed to someone? And is this one addressed to someone? And I'm suggesting that even in the very broad sense Chief Justice Kuczynski is positing, it's always addressed to someone. But he was talking about the threat, and I'm talking about who it's addressed to, and it wouldn't be meaningless if it did have to be addressed to some natural person. You mean postally addressed? No, I mean inside the letter, dear so-and-so, or some way of knowing who's supposed to be reading this. I do believe that it would be meaningless because anything that's a threat is going to be directed to somebody. You can't threaten yourself. That's the threat, but what about the letter, the communication? Exactly. Well, the letter has to be threatening some other person. Well, it is. It says I will slay your children. Exactly. Anyway, what about the true threat? Let's get to the true threat issue. Curt Havelock in this case was imprisoned for the content of his speech, which is something which is presumptively invalid and can only be sustained if the government bears this burden of justifying it as speech that was unprotected, the content being unprotected by the First Amendment. The only justification the government has ever suggested in this case is that it was a true threat, the type of speech which is exempt from First Amendment protection. Now, his letters arguably contain threats other than the threat to shoot people on Super Bowl Sunday. Does the existence of such threats raise a triable issue, a fact for a jury to decide? No, because the undisputed facts in this trial made it clear that his intention was that no one was going to read this manifesto until after his death was a widely known public fact. His high-profile suicide by cop at one of the greatest, most viewed events in the course of the American year. And, of course, the understanding is, his intention was, no one was going to read that thinking the person who wrote these statements could come and harm them because he's dead. It could only be threatening to someone who believed in zombies or whatever form of life after, menacing life after death one sees in horror movies. And that's the basic flaw in this theory that this was a true threat or that it constituted something. What if he were not shot by a cop? What if the cops didn't shoot him? Let's suppose he went forward with his plan, shot up the stadium, killed people, and the cops didn't hit him, and he then decided to keep on going, bloodlust or whatever it was. How would the recipient of this letter know that somehow that threat was supposed to have been ended by suicide by cop and that that would be the end of it? There was no dispute, and I think correctly there was no dispute, that the fact that makes the key moment in time and the key fact in terms of Mandrea was what was his intent when he put these things in the manifesto? Yes, I understand that, but you're saying that because he said suicide by cop, that that was the be-all and end-all. The district court found that there were other, and there are other statements in the manifesto that talk, I will kill, I will do things, things that could be done in the future. So why isn't it for the jury to be able to look at the totality of all the language and say, is this a closed-end communication, that it absolutely forecloses the notion that once started, if he isn't stopped short by the police, that he will not continue on his own? Could the jury have found that fact? They've heard all of this argument, I take it, that testimony that his subjective intent was to, in effect, commit suicide in this glorious manner. But there were some aspects, or are you saying that there was no way to go to the jury at all? It should have been directed for him right at the get-go. It should never have gone to the jury. It should never have gone to the jury. And in reviewing whether this speech fell within First Amendment protection, of course, this Court needs to conduct an independent review under Planned Parenthood. Taking the undisputed facts is true. The undisputed facts show why it should never have gone to the jury and why it flunks that independent review. Because it was undisputed here that his intention is not just things he said in the manifesto. It's the overwhelming evidence and the undisputed facts. But doesn't all of this turn directly on whether it's – on what the requirement for a true threat is, whether it's subjective or objective, at the front end? In other words, a threat has to be something that a person would reasonably understand to be threatening. But the question is, does the person perpetrating the threat have to subjectively intend that, or is it an objective standard? And my recollection is that Planned Parenthood, in the majority opinion, placed an objective standard, but there's some question about whether Virginia v. Black leaves that, and our case law is kind of a mess about it. But isn't that the key question? No. Why? Because it clearly fails under either test. The undisputed facts, the undisputed clear evidence here was his subjective intention was to commit suicide. Right, but the subjective intention doesn't matter. No, the subjective intent is required to meet the First Amendment standard, but the intent has to be to threaten, not to harm. So what was the evidence of the subjective intent to threaten? What was the evidence of subjective intent to threaten? Right. I don't think there was any. Well, what about the phrases, I will shed the blood of the innocent, I will slay your children, I will sacrifice your children? What about the fiancée testified that when the defendant talked to her that he was contemplating, he told her he had bad thoughts and he threatened a lot of people. What about the truck owner when a half-large staff testified that the defendant in his presence said, I sent out threatening letters? Isn't that evidence of subjective intent? No, because none of that changes the basic fact that he sent these things with the understanding and the intention that no one can read them not knowing what the speaker said. Doesn't that just make it a jury issue? I mean, you're asking us to just ignore that he told his fiancée and his father that he sent out threatening letters. She said she couldn't remember him saying that. His father said he didn't understand him to be saying he intended to threaten. But just the fact that we're having an argument about it, doesn't that make it a triable issue? No, because that's simply a choice of words that he made. This Court needs to undertake an independent review under Planned Parenthood, and that fact may be considered in the context of its review of the facts, but those comments, that choice of words that he may or may not have made, doesn't change the underlying fact that his intention, objectively or subjectively viewed, his intention under the circumstances was that no one could read these things. Well, if you objectively viewed it, you could look at this and you could say, as Judge Fischer was saying, how did he know he was going to die? And the mention of Super Bowl whatever it was in one sentence, and one could certainly objectively take this as a much more general threat to do terrible things. Well, the objective standard would look at what a reasonable speaker would expect under the circumstances, and he understood those circumstances as that the readers would know he was dead. I'm going to reserve the balance of my time. Thank you. Good morning. My name is Michael Morrissey, representing the District of Arizona. Mr. Morrissey, I just have a quick question because I don't think you really emphasized this too much previously. What is the government's position on the definition of person in Section 876? Well, the government argued below in the district court and at the panel that the person threatened must be, the object of a threat, must be a natural person. Okay, so that was your position previously. Do you now have a different position? No, it is still our position. We agree with Judge Graber in the dissent that nothing in the legislative history suggests that this does not cover communications not mailed directly to a natural person. However, the context of 876C, which talks about an intent to kidnap or an intent to injure, suggests to us that addressed to a natural person here still means a natural person and that it does need to be a human being who is the object of the threat. But the object of the threat is the person to whom it's addressed. The question is, no matter how you take addressed, whether you take it the way some of us were suggesting or whether you take it as being on the envelope, it still isn't the person who's being threatened. So the question is, to take this communication as an example, how is it addressed to a natural person either on the envelope or inside it? Oh, okay. On the outside of the envelope, the government agrees that it was not, they were addressed to media corporations. That's the address C. Okay. So let's assume that, but that the communication is what we're looking at. And who is that addressed to? And the communication includes a letter. Is that still addressed to the corporation? No. The communication here. Well, what does it say? Dear New York Times, right? No. It starts with. Does it say dear person, dear someone's name? It does not. Okay. The salutation does not really aid the government. You must go to the contents of the communication. Is there a salutation? No. I think it might say greetings. No, it doesn't. Okay. Let me try to stay with who is threatened. Can you, before you jump into the, I didn't quite get your answer on the envelope. Are you saying that the envelope has to be addressed to a natural person? No, no. Your position is that the envelope can be addressed to a corporation, a person in the dictionary, but within the contents, the threat itself has to include a natural person. Yes. That's not what he said. That's what Judge Fisher said. That's what I meant to articulate. He said the envelope is not addressed to a person, but that you can find the threat and the address to in the contents of the communication. Yes. That's not what Judge Fisher said. Okay. I apologize. People get nervous. I meant to articulate what Judge Fisher was saying. To me, addressed to refers to inside the envelope the contents of the communication, and that is the argument that I was trying to make. You are not arguing that the envelope is addressed to a person? No. Okay. All right. So how is the letter, or the communication, the manifesto, how is that addressed to a person? Not how is there a threat to a person, but how is it addressed to a person? We'll get to the threat after. Because address means to communicate directly with, to speak. As the panel pointed out, there are multiple definitions of address, and the broader one, which includes to communicate, to speak directly to, which several other circuits, the Williams Court and the Rendleman Court, have also found that address means to communicate, which includes the contents of the conversation. Would any content that's written in English or some language that's known to human beings meet that criteria? Because anything that's written in a language presumably expects a reader. It's mailed. So some human has to read. A corporation can't read. So would that meet the criteria? I'm not sure, because here it has never been the government's view that the object of the threat, and it's not a requirement of the statute, was the recipient of this mail. The object of the threat does have to be a natural person. Here, to try to answer Judge Berzon's question, the natural persons threatened were the individuals in the vicinity of and attending the Super Bowl. And the contents of the communication are quite clear that that's who this individual was threatening. That's right, but not really relevant. Because now you've switched to who is the object of the threat, as opposed to the question we were discussing, which is to whom the threat is addressed. And those are two different things. If I say, I will kill your dog, or if you don't pay me money, the threat is to whom? The threat is to me, if you say that. To you. To you, right. And even if the dog winds up being a human being, the threat is to whom? The threat is addressed to whom? If I write to you and I say, if you don't do X, I will... You're threatening me, Judge, in that scenario. Okay. But the question is, to whom is the threat addressed? To use the statutory language. That threat, even under the statutory language, is still addressed to me. Okay, so let's now switch to our case. To whom was this threat addressed in the government's view? We know that the people who were going to be hurt, or were threatened to be hurt, were various people out there. But to whom was this threat addressed? It was addressed to those people. But they are not going to read the letter. But Congress did not engraft into the statute a requirement that the person threatened be the person to whom delivery is made. And Congress didn't even require... I can understand how something can be addressed in the Gettysburg address sense to somebody who actually, one way or the other, directly or indirectly hears the communication. But how can you address somebody unless there is at least a possibility that that person is going to actually hear the communication, or read, or understand, or be a recipient of it? But there was that possibility, because, for example, in this instance... I'm sorry. You're agreeing that there has to be that possibility. So if... I'm trying to wait for the completion of the question. So if it turns out that it's not possible that the people who are the actual targets of the threat will find out about it, then it's not addressed to them. No, Judge, that's not my argument. Because take the United States v. Stewart case, for example, where the person threatened was Judge Silver. As this Court pointed out, there's no requirement that Judge Silver even be made aware of that threat. So that is not required for there to be a true threat. How can you address somebody? That's a question I asked you two minutes ago. How can you address somebody? I can understand addressing somebody in the Gettysburg address sense that you are speaking to them, you're addressing them. But how can you address somebody if you don't even have a theoretical possibility that they will hear what you say or be made aware of what you say? Well, that is still your intended audience. No, it's the intent of the threat. I mean, this says precisely any... That's the person of the addressee. It doesn't say person, by the way, or of another. So there's two things going on. First has to be addressed to any other person, and then it has to contain a threat to injure that person or someone else. So you keep going to the second, but you're not dealing with the first. I believe that delivery instructions aside, because that's the addressee, that the contents of the communication do bear upon to whom it is addressed. So address any other person means nothing? No, it means who you're speaking to, who you're communicating with. All right, so who were they speaking to here? They were speaking to the people who were attending the Super Bowl and the people who were within the sights of his scope. Let's not forget Judge Fischer's, what he pointed out about the other threats in case he survived. Let's assume it was only directed at the people who went to the Super Bowl, and it was mailed how soon before the Super Bowl? Hours. Hours before, so... Or to Sunday. So there was no possibility that they would become aware of it in any form before the event was over. Would that still be a threat? Yes. And, Judge, I don't quite agree that there was no possibility that they would be aware of it. And I have to point out that as one of the judges made the note, as Mr. Havlock said, this was the Super Bowl event, so it did not end with the last kickoff of the game. But given the security surrounding the Super Bowl... Well, how does the Super Bowl not end with the last kickoff? I mean, I'm a football fan, not an expert in addressing, but... As an example, Your Honor... I'm nervous. Okay. So you have to get really basic here. As an example, I was precluded, and this is in the record, from putting in evidence that the Patriots were made aware of this threat after the game and were going to change their travel plans. In other words, despite the fact that the last play of the game had occurred, this threat lived on and still had the power to affect people's actions and affect law enforcement and affect... But how would it harm them other than... You made this argument in your brief, and I didn't follow it, because you said, oh, there would be economic harm and people... But how would there be harm or injury flowing after this Super Bowl, as you define it as a larger event than just the game? But, Judge, that's the result. The issue is whether or not there was, in fact, a threat. And so if you have somebody who's threatened to do something, he hasn't succeeded yet, no rational person would say, oh, good, he promised only to kill me while the Super Bowl was being televised, so now I'm safe. So the threat lives on. We have two things that the time deposit of the threat affects. It's both the objective definition of threat and the subjective intention to threat. And it seems as though it undercuts the subjective intention to threat that he put it in a mailbox on a Sunday when mail was neither picked up nor delivered, and it's the same day he's going to start shooting or bombing, whatever he's going to do at the Super Bowl. Judge, I understand that argument, but that was squarely presented to the jury. Right, but we have to, under Planned Parenthood, we're supposed to conduct an independent de novo review of this. Respectfully, I would assert that Planned Parenthood, because it deals with the objective standard, that's the incorrect. It doesn't just deal with the objective. The statute had a subjective intent element in Planned Parenthood. But Planned Parenthood did use an objective test. Well, to define threat is what it used an objective test for, to define threat itself. And I would point out that this Court in Sutcliffe said, specific intent to threaten and whether something is a true threat, that an ordinary citizen can understand a threat to kidnap or a threat to injure, and that the jury's verdict in that respect is entitled to the deference of the review in the light most favorable to the government. But, by the way, was the jury instruction here? Was it subjective? Yes, very much it was subjective, that the government had to prove that defendant deposited with intent to threaten a communication that threatened a person. And going back to the delivery point, Congress has never— I'm sorry, and what made this a threat? Because it said something would happen in the future. What if we change the fact just a little bit, and it says, the letter said, by the time you get this, I will be dead, and what I would have done is shoot your children and take revenge against the patriots, and speaking sort of in the past future tense, I guess, it is sort of, I will have done— Yes. What tense that is. So, just a chronicling, and I just want you to know why I did it. And deposits in the mail on a Sunday where there is no possibility that it will be seen until at least Monday, probably Tuesday, right? Yes. Is that still a threat in your view? In my view, that's a very factual question, and I'm not sure, because a threat denotes future conduct. And if, in your hypothetical, there is no possibility— Well, as of the time the letter is deposited, it is future conduct. He's detailing what he will have done by the time the recipient reads the letter. It turns out he checks out, as he did in this case, and doesn't do it. So, it is not like saying, you know, six months ago this is what I did. It is, in a real sense, a chronicling of future planned behavior. That is a threat, and it is clear that under the statute that you measure subjective intent to threaten at the time of the mailing. Well, but you're kind of getting into it. You know, I call it what—we can't be the thought police, all right, in terms of just because people rant and, you know, all of those. And, you know, obviously if he hadn't killed— well, let's say he didn't kill himself and he went and killed a bunch of people, then he would have been charged with killing those people. We wouldn't really be talking about the threat then at that point, right? And, obviously, at the time when he tells his father, well, I've changed my mind, and they go to the police department, the police department says, well, we can't think of anything to charge you with, but we'll send it to the FBI. You know, it's—my concern is, you know, why isn't this just his rantings with never, you know— I mean, no intentions to go forward with it, and, you know, why aren't you asking us to be the thought police? I mean, if you think about it, you know, I've thought about, you know, most people that get divorced think about killing their ex, but they don't do it. And they don't send a letter saying, I'm going to kill you. So just the fact that someone thinks, I really hate you, I want to kill you, and never does anything about it, we're not going to charge a person with a crime, right? They're going to have to do more. Sure, but this is very close to Sutcliffe, okay, where the defendant did more than think about being angry at his former employers. He made real threats. But the whole point of the threat statute is to deal with not the actual occurrence, because as Judge Callahan says, if he killed somebody, you're charged with killing them. Instead, it's to deal with the fear and also the police energy that's needed and so on if somebody thinks somebody is going to kill them in the future. And his intent was not to set that up, wasn't it? Wasn't his intent not to have that situation because it would already have occurred and nobody was going to be upset by the threat. They were going to be upset by the killing. It's a different problem, not a good one, but a different one. I think factually I don't agree. Two of the mailings did get through to the city of Tempe and the liquor board. Those were uncharged. Correct. Correct, that's right. But we're discussing his intent. Were those mailed on that Sunday? Yes. And how did they get picked up? Where were they mailed? Same place. What happened was Mr. Havlock, this is obviously a deposits case, Mr. Havlock, in the hours well after the Super Bowl, identified from where he had made the mailings and so law enforcement and postal went around and did retrieve from the processing centers. But besides which they were uncharged. Right. But, Judge, I thought your question went to how do we figure out his intent and we figured that out through what his actions were. That's why I keep raising Sutcliffe is because his evidence of weapon possession, of buying that weapon specifically to commit a massacre, driving to the Super Bowl, sitting there with his AR-15, all that bears upon, we're not being thought police, all that bears upon whether or not he had a true subjective intent to threaten and then in return. No, it's whether he had a true subjective intent to do this. Clearly he did up to a point. But that's not the question. The question is did he have a clear subjective intent to threaten? And coupled with United States versus Twine where we stand out here by ourselves saying prove specific intent to threaten. Would you answer Judge Berzon's question? Because I think that's a very important question. And I think that factually the jury was entitled to credit statements made within hours of mailing the letters. I sent threatening letters, Mom. And to his fiance, I threatened a lot of innocent people in the letters. I think that was absolutely sufficient evidence from which the jury could conclude from his own words that he had had the subjective intent to threaten at the time he created and mailed this communication. He had the intent to do what he thinks is a threat, not necessarily what's a true threat under the First Amendment or a threat under the federal law, right? No, Judge, because how you measure a true threat is subjective intent is what takes it out of protective First Amendment speech. And this Court has found that, that subjective intent to threaten, true threat is what gets it out of the First Amendment. So you never get away in true threat on this Court as review from determining this defendant's evidence. You don't think you need an objective threat? No, it's his subjective intent to threaten. Let me give examples. In both Rendleman, which goes the other way than the panel did, and in Lincoln, which is from this Court, the people making the threat were in prison at the time. So their ability to carry it out wasn't going to be terrific. That wasn't realistic. Nonetheless, they still had the intent to threaten. It always goes back to the individual, and that's what the government proved in this instance. But what facts would you say supported the jury's conclusion of an intent to threaten? You mentioned the use of the term threaten when he spoke. Anything else? The facts were his actions in buying the weapon, downloading the map of the Super Bowl, all his preparation of acquiring the weapon, writing the letter, proceeding to the Super Bowl, and his statements to his fiancée and to his mother. If I thought everything up until the statements was totally irrelevant because they had nothing to do with an intent to threat, then what? Well, you should still affirm for two reasons, because Sutcliffe says that that which goes up to the time to threaten still matters. And then you would also give due credit to the jury's ability to resolve these issues. The court in Stewart talked about the important role of the jury in weighing whether or not somebody is serious or joking and the emphasis of the threats. But you agree that the essence of a threat is that it has to involve future events. Yes. I can't threaten you with what I did last week. Last week I really wanted to beat you up. Could I just say there's a tricky issue there, which is this court decided Delafuente as well, which is a mailing case as well, a deposits case, where the powder breaks apart in processing, and this court has found that constitutes a threat. The Second Circuit in Davila also found that a powder that's contained in the threat, and the defendant argued, well, wait, the harm, it's already occurred, and that's been cited in the defense brief. Therefore, that can't be a future threat. So with that condition, yes, a threat, and this threat in particular, denoted future conduct. I'm not sure I understand your condition. I believe the court was saying to me, is it always something that's future, and what I'm saying about a threat is in the past. Well, let's talk about past conduct. I can't threaten you with past conduct, with past, right? Right. I can't say, you know, I saw you last week and I really, really wanted to beat you up. That's not a threat, right? Right. And if you write something which at the time of the writing, at the time of dropping it in the mail, is in the past, then it can't be a threat. Right. But if it's something that's in the future as of the point you drop it in the mail, but in the past as of the time when it's going to be read, do you view that still a threat? It certainly can be. It's in that in-between time period. It's a factual, yes, and that's a factual question the jury was entitled to resolve. Well, just a minute. Let's go on further. It worries me that I don't know whether when I'm called upon to determine if there's sufficient evidence to sustain the jury's verdict, which it seems to me I'm really looking at to some extent, in Rendleman, the letters were certainly statements of future tense. When I'm released from prison, I'll kill the president. And the Rendleman court, the Fourth Circuit said those are true threats. In this case, this defendant couldn't have carried out those threats. There was no way for him to have carried out those threats. I mean, he says, I mailed them. It's going to happen before they even get there. How does that jive up, I guess? Because, Judge, he said, I will slay your children. I will shed the blood of the innocent. That's going to happen before they even know that he said it. If he has that threat and he's threatening those people, they don't care whether their children are killed the day in the Super Bowl or the day after. But they're never going to see it. In other words, when I read the Rendleman and I try to make this case with that, again, I'm still seeing, yeah, they are future tense, but they're only going to be read after he's carried out what he's planning to do. Let me ask you just another way. Was there any evidence in the record that Havelock believed that the letters would actually be processed through the mails that day? No. So was there any evidence that was contrary to that, that he believed it wouldn't be processed that day because it was Sunday? There was evidence, certainly, on the process through which these letters went, and there was testimony as to their probable dates of delivery. What were the probable dates of delivery for the letters addressed to the media? There was a range established from, I believe, Monday through Wednesday. So clearly, as evidence of his subjective intent, it would have been after he killed himself and others. But that's the wrong measurement date. Congress has never said that you worry about the time of delivery of the threat. Right, but you have to worry about the intent at the time in trying to understand whether these were truly threats or whether, I mean, even the fact that he sent them to media outlets tends to indicate he was doing it to publicize the event and get a message across to the public. He did say he was targeting the event in his statement to law enforcement afterwards. That's Exhibit 67. And that, in my view, supports the government's view that in targeting the event, he was not solely focused on whether or not he was able to kill everybody by the last play of the game. This was an ongoing threat. The Joint Operations Center that deals with security at the Super Bowl was stood up for several days after the Super Bowl because of exactly this type of issue. Now, what does that mean? I mean, everybody goes home, so how is he going to kill them? Actually, the testimony was not everybody goes home. Agent Angst, who operated the Joint Operations Center, gave testimony as the teams were still there, the security was still being provided, the tourists were still there. The teams were still there the next day? Days after the Super Bowl? I was precluded from putting in departure dates. Well, okay, but anybody with any common sense knows the teams don't stay at the Super Bowl for days after the event. They're having a parade. But there's all the tourists and all the crowds and all the people who were there for the event. They're not at that place. They may be around, but they're not at that spot. Okay. I'm not sure. That's a tourist spot where the Super Bowl happened to be played. Which stadium was it? It's at the Westgate, now it's Cardinal Stadium. The Giants and the Patriots. Yeah, the University. But also, doesn't all the evidence that you're relying on, that he gathered all the arms and he went to that place at a certain time and so on, does that cut precisely against you in terms of what his intent was? His intent was to go there when he went there with the arms that he had and to shoot people then, and then he decided not to. That was his intent. No, Judge, an intent to threaten and an intent to murder can be two different things. Absolutely. Okay. And that's, I believe, what you're focusing on, in my view, to the government's detriment. I'm trying to focus on what his subjective intent was when he made the threat. His subjective intent was, I'm going to go there at a certain time, I'm going to do this thing then, I'm going to be killed myself, and this is all going to come out afterwards. I think that's rewriting the facts at trial. Tell me how. Exactly. Really, I don't see how. Because I don't know why this court would set aside his own statements that I sent threatening letters, that he threatened a lot of innocent people in the letters. So all I'm trying to say is that is all you've got in the end. I mean, in other words, either that's enough or it isn't. And the weapons possession, which case law says does bear on whether or not he had intent to threaten. If you take away the evidence of his preparation with the weapon, proceeding to the Super Bowl, and you take away his own statements, which refer to what his threats were, then, yes, the government has less evidence on intent to threaten. Do you distinguish, then, Lincoln in this argument? Because it seems to me that Lincoln, we held, that a reasonable person could not foresee that the letter in Lincoln was a serious threat to the president, and therefore reverse the conviction. If I suggest that in this particular instance I cannot see that this is a serious threat, then it seems to me I go right along with Lincoln. He puts them in the mail. He goes right down to do something. Nobody's done a thing. Nobody will know anything. Why is not Lincoln controlling? Because Lincoln, in particular, spoke about all the defendant did in Lincoln was endorse the violent acts of others. But Lincoln applied an objective test, not a subjective test. And that's true as well. But what I'm trying to point out is... But you say we should not follow. So that doesn't answer Judge Smith's question. How do you distinguish Lincoln, which applied an objective test? Because Lincoln wasn't threatening to do anything himself. What does that have to do with whether it's an objective test, which you said we should not apply? Because if Lincoln wasn't going to subjectively do it himself, if he subjectively had no intent to threaten, then Lincoln doesn't bear very well on the facts before this court. And that's why even giving the jury the light most favorable, it was not a true threat in that case.  Thank you. Mr. Morrissey is a brilliant prosecutor. And in the course of this prosecution, Mr. Morrissey was a prosecutor at trial. Even Mr. Morrissey, who always says the right thing, couldn't help observing the obvious when he said in his opening statement, quote, he described the manifesto as, quote, a document that he would mail out that would explain his actions in shooting people at the Super Bowl. Close quote. That is an accurate statement. It was an after-the-fact intention to send something to be read after everyone knew about what had happened, not to threaten anyone, but to explain his actions. Is it a confession? Of sorts. He intended it to bring about social change. Let's say things had played out just a little bit differently, and your client got to the Super Bowl, had a change of heart, but instead of going home and blabbing to his family, just did nothing. Just hid his weapons, said not a word to anybody. Didn't turn himself in. What would have happened next? Probably nothing. Nothing is not quite right. The letters would have arrived, they would have been opened, they would have been read. Chances are good they would have been either publicized or sent to the authorities. Right. Mr. Havlock would have had a welfare check. I'm not sure about that. You don't think the police would have gone to visit him if the New York Times said, hey, this is what he was talking about doing? The only reason I say maybe, maybe that's right, but maybe not, because I think if you go to any major newsroom, every day the mailroom gets rambling crazy diatribes from strange people all over the place. We get strange letters, too, but if somebody says some of the stuff that's in this letter, I think that would be taken pretty seriously, and serious efforts would be made to figure out who sent it and maybe get the FBI involved or somebody to look into it. But let's say the letters had arrived and they were made public. You don't think that some of the people involved with a Super Bowl, in and around a Super Bowl, would feel threatened? This guy is out there, we don't quite know who he is, he hasn't been apprehended, he sent these letters, he said he would do the Super Bowl, but maybe he didn't come off, but he's still out there with ordinances on. You don't think that people would feel within a zone of danger, the teams, the fans, people living around the stadium, people in traffic patterns around the area would feel like maybe they shouldn't go out that day, or the next few days, because they might get killed? Under that scenario, it's possible people could have ended up feeling threatened. The reason I don't think it matters is that that was not his intention. Well, how do you think they would have felt if, when the letters came out, the law enforcement had picked them up, taken them to court, and sent them out for a psychiatric examination? Then do you think people would have felt secure? Possibly under those circumstances, yes. Obviously, this was somebody who had no criminal record. Somebody who obviously had some screws loose. You don't want to even admit that. You don't want to admit anything when you're here that might help your client. I'm happy to admit anything that will help him. He was evaluated by a social worker on the night he turned himself in, who said he wasn't under the influence of any defects. He was under extreme stress, which led him over the brink temporarily, and then he quickly snapped out of it. A social worker may have said that. A psychiatrist, having sent him for an examination, as the court could do, would have made everybody feel a lot better. Very possibly, yes. All right. But isn't, in terms of what the jury could have relied on, in Judge Kaczynski's scenario, there would have been more for the jury to rely on with regard to what his intent was, because this letter really doesn't say much about the Super Bowl. If I just read this letter, I could think there was an inchoate threat rather than one that's just directed at the Super Bowl, couldn't I? It does identify Super Bowl XLII by the Roman numeral. Yeah, once. Yes. In this sort of joke about, I survived Super Bowl XLII, that's about it. Yes. So certainly just the letter itself could lead somebody to be concerned about something other than the Super Bowl. It could. And if he then disappeared after the Super Bowl, rather than turning himself in while the Super Bowl was still going on, that would be some evidence of what his intent was in sending this thing in the first place, no? No, because it was undisputed on these facts, even if things turned out differently than he intended, which they did, as it happened, fortunately. There was no dispute that his intention when he put these things in the mailbox, which is the key fact. That's what he said. But if there was evidence that he then, instead of walking in and saying, you know, right away and telling them what was going on at that point, he had just left, somebody could say, well, you say that's your intent, but here you wrote a very general letter and you didn't own up to it. So I don't think it was your intent. Okay. Then I will acknowledge that those facts might bear upon what his intent was when he mailed the documents. Had those been the facts on the record, that might potentially lead to some question about whether he had the intent to threaten. On the facts that we have on this record, there really was no dispute that he didn't have the intent to threaten. He had the intent to, as Mr. Morrissey put it in his opening, explain his actions after the fact. Well, but after the fact, it is not after the fact when he drops the letter into the mailbox. At that point, he knows that he still has a choice as to whether to go forward with the actions. But once he drops it in the mailbox, he no longer has a choice as to whether the communication will reach third parties. I mean, you know, the mailbox might get struck by lightning in Phoenix, and destroyed, but failing some operation like that, there's nothing he can do to keep it from being read. Okay. So, you know, this idea that this is a chronicle of past events really depends entirely on him. It's a chronicle of past events if he chooses to make them past events, or it's not, in which case, as happened, in fact, by the time the letters were read, it was not past events, so it became something more like possible future events, right? Well, I would go back to the fact that it was clear that, under the circumstances, his intention was that it would be a chronicle of past events, because he put it in the mailbox on a Sunday, not that it matters it was a Sunday. On a Sunday, after the kickoff had been kicked, and the game had started, and he was going to do this, there was no dispute that he was going to do this with the purpose of getting killed by the cops in connection with that game that day. That was undisputed. So no one was going to read these things. His intention was that no one was going to read these things until he was killed that day. The social worker interviewed him confirmed his intention was to do this attack on February 3, the Super Bowl day. The recorded interview, trial exhibit 67, he confirmed it was going to be on Super Bowl day. This was all going to happen. And in the opening statement Mr. Morrissey gave, he said that he expected to be killed once he started shooting into the crowds at the Super Bowl. Okay, thank you. Thank you. I'm sorry I was dancing with you. Well, I'm done.
judges: Kozinski, Schroeder, B Fletcher, Reinhardt, Wardlaw, Fisher, Berzon, Rawlinson, Callahan, Ikuta,nr Smith, Cjj